### IN THE UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GERALD PAUL BODET JR.** | : | |
| **Et. al.** | : | |
| **Plaintiff** | : | **CLASS ACTION COMPLAINT** |
| | : | |
| **v.** | : | **No. 09-3068** |
| | : | |
| **CHARTER COMMUNICATIONS** | : | |
| **INC. AND CHARTER** | : | |
| **COMMUNICATIONS HOLDING** | : | **JUDGE: FELDMAN** |
| **COMPANY, LLC.** | : | |
| | : | **Magistrate: Shushan** |
| **Defendants** | : | |
| | : | |

### THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs hereby submits the Third amended petition on behalf of Gerald Paul Bodet, Jr. Et. al.  Plaintiffs wish to notify the court for purposes of judicial efficiency this complaint contains all allegations contained within the original Class Action Complaint the First and Second Amended Class Action Complaints previously filed in this matter. Therefore, the Court and the Defendants may look to this document only to address all issues pertaining to this litigation.

**Gerald Paul Bodet, Jr., individually and on behalf of all others similarly situated,**" (hereinafter referred to as Plaintiff, Plaintiffs or Bodet.) bring this Third Amended Class Action Complaint against **CHARTER COMMUNICATIONS, INC.,** **CHARTER COMMUNICATIONS HOLDING COMPANY, LLC.**, and **CHARTER**

**COMMUNICATIONS, LLC.,**  (hereinafter referred to jointly as "Charter"), and allege the following:

**INTRODUCTION**

1.      This is a class action brought on behalf of all persons who have purchased Premium Cable, as defined herein, from Charter and who have been compelled to rent a set-top box distributed by Charter.  Premium Cable subscribers cannot view or access all of the services to which they subscribe without a set-top box, which connects to, and is essentially an extension of, a television set.  Charter abuses its substantial economic power in the market for Premium Cable by forcing subscribers, as a condition of purchasing its Premium Cable services, to rent the set-top boxes that it distributes.

2.      That conduct enables Charter to severely constrain competition in the market for the sale or lease of set-top boxes and to extract supra-competitive profits from Class Members.  Charter's conduct has had and continues to have substantial adverse effects upon interstate commerce and has caused and continues to cause direct economic injury to Class Members.

3.      As set forth below, Charter has tied the distribution of set-top boxes to the provision of Premium Cable and has thereby unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**THE PARTIES**

4.      Plaintiff Gerald Paul Bodet is a citizen of the State of Louisiana who resides in St. Tammany Parish.  At all material times, Plaintiff Bodet has subscribed to Premium Cable provided by Charter and rented a set-top box from Charter.

5.      Defendants Charter are Delaware corporations with their principal place of business in St. Louis, Missouri.

6.      Among other communications endeavors, Charter provides multi-channel video programming distribution through a cable network and leases set-top boxes.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, in that Plaintiffs, on their own behalf and on behalf of the Class, assert claims under the Sherman Act, 15 U.S.C. § 1.

8.      Venue is proper in this Court under 15 U.S.C. § 22 because Charter may be found here and transacts business here.

## FACTUAL ALLEGATIONS

9.      Charter is one of the five largest providers of cable multi-channel video programming distribution ("MVPD") in the United States providing services to customers in 27 states.

10.     Cable MVPD providers tend not to compete with one another and face little, if any, competition from MVPD providers who use another format besides cable. Accordingly, Charter has substantial economic powers in the areas in which it operates.

11.     Charter, through the conduct described herein, abuses its economic power over cable MVPD and commits a classic tying violation.  More specifically, it compels consumers who purchase its Premium Cable services to also rent a separate product that it distributes.  That separate product, a set-top box, is essentially an extension of a television set, which consumers must use to access the full range of Premium Cable services that they have purchased.  The monthly rental fee that Charter forces consumers

to pay for set-top boxes quickly adds up to more than the cost that Charter pays to purchase set-top boxes from their manufacturers.

<u>The Tying Product: Premium Cable</u>

12.     Charter, like other cable MVPD providers, offers two cable products, Basic Cable and Premium Cable.

13.     Basic Cable consists of a relatively small number of networks or channels, including local channels.  For that service, Charter charges a monthly fee that varies slightly from one location to another.

14.      Premium Cable is a higher quality, more extensive and more user-friendly product than Basic Cable.  It includes an interactive programming guide, which enables subscribers to quickly navigate through their substantial array of channels and determine when and where particular programs will appear; pay-per-view, which allows subscribers to purchase special programs like live sporting events that are not otherwise broadcast; on-demand, which allows subscribers to watch certain programs whenever they choose simply by pushing a button; high-definition channels, which present programs in a crisper, more life-like format than their standard counterparts; a range of premium and specialty channels such as the History Channel and various sports channels; and a range of channels that subscribers can pay to receive such as HBO.

15.     Premium Cable is a uniquely desirable product because it allows consumers, without leaving the comfort of their home and without resorting to multiple systems, to efficiently sift through a wide number of programs and find one that suits their interest at any given moment.  As discussed in further detail below, at least 3,218,100, and likely more, of Charter's cable customers subscribe to Premium Cable.

16.     Customers who subscribe to Premium Cable must also subscribe to Basic Cable.  They pay a significant additional monthly fee for Premium Cable, which also varies somewhat depending on what services they purchase and where they live.  When subscribers access their pay-per-view service and order a particular pay-per-view program they pay another fee.

17.     A testament to Premium Cable's popularity, the Federal Communications Commission's ("FCC") Thirteenth Annual Report ("the Report") on video programming, released this year, indicates that in 2005, there were almost 97 million Premium Cable subscriptions in the United States.

18.     The popularity of Premium Cable is shaping the entire cable MVPD industry and, as the Report notes, is one of the major factors behind the industry's projected growth to $72.9 billion in 2006, up 11.1 percent from 2005.

19.     As described in further detail below, Premium Cable subscribers cannot access Premium Cable by simply plugging Charter's MVPD cable into a television. Instead, they need an additional product to interface between the MVPD cable and a television.  In contrast, Basic Cable subscribers can access Basic Cable by plugging the MVPD cable into most modern televisions, which are "cable-ready."

20.     A digital receiver or digital converter, which is commonly referred to as a set-top box, is the only product that provides an interface between an MVPD cable and a televisions and that allows customers to access all Premium Cable services.

21.     As defined herein, Premium Cable means cable video services that subscribers cannot access merely by plugging an MVPD cable into a cable-ready television.  That definition includes all of the services described above.

22.     Premium Cable is the tying product.

The Tied Product: Set-Top Boxes

23.     A set-top box is essentially an extension of a television set that enables consumers to use and view Premium Cable.

24.     Most televisions sold in the United States during the last decade are capable of receiving certain programs transmitted through a cable MVPD system. As a matter of pure technical capacity, such "cable-ready" televisions would allow consumers to access most premium channels available on Premium Cable.

25.     Cable-ready televisions cannot, however, access the interactive programming guide, pay-per-view, or on-demand services that give Premium Cable much of its value. To access those services, consumers need the ability not just to receive signals from a cable MVPD system, but also to communicate with the cable MVPD system and transmit a particular selection from a range of options. It is precisely those services that allow subscribers to personalize their programming choices and that give Premium Cable much of its value and define its unique product nature.

26.     A set-top box is the only product that has the required two-way communication capability that allows consumers to access the full range of Premium Cable services. Premium Cable subscribers must therefore have set-top boxes to access their interactive programming guide, pay-per view and on-demand services.

27.     Consumer electronics companies, such as Motorola and Scientific Atlantic, manufacture set-top boxes.

28.     Consumers have demonstrated a demand for acquiring set-top boxes apart from Premium Cable.  In response, such retail vendors as www.newelectronix.com sell set-top boxes for approximately $110.

29.     As described in greater detail below, Charter forces consumers who purchase Premium Cable to rent set-top boxes from Charter for a monthly fee.  That fee is in addition to the fee subscribers pay for their Premium Cable services and is clearly marked on their bill as a fee for set-top boxes.

30.     Charter's practice of tying set-top boxes to Premium Cable forecloses most of the competition in the market for set-top boxes.

31.     Set-top boxes are the tied product.

<u>Consumers Who Purchase Premium Cable From Charter Are Also Forced To Rent Set-Top Boxes From Charter- Coercion to Purchase the Tied Product</u>

32.     Charter forces consumers who purchase its Premium Cable service to rent the set-top boxes that it distributes.

33.     The Report notes that this practice is common throughout the cable MVPD industry.

34.      In order to receive interactive TV services offered by Charter, such as the Interactive Programming Guide (IPG), On DEMAND or Pay-Per-View, you must rent a set-top box.  For each of its Premium Cable packages, set top box rental is required.

35.     When Premium Cable subscribers contact Charter regarding set-top boxes, Charter's representatives reinforce the requirement that the subscribers must rent set-top boxes from Charter.   More specifically, Charter's representatives state: (1) that if subscribers do not have a set-top box, they will not be able to access the interactive programming guide, on Demand, or pay-per-view services, (2) that subscribers cannot

purchase a set-top box from Charter, and (3) that if subscribers obtain a set-top box from any source other than Charter, it will not work on Charter's cable MVPD system.

36.     That set-top boxes obtained from a source other than Charter will not function on Charter's cable MVPD system is another means of requiring consumers to submit to its illegal tie.  The reason those set-top boxes do not function on Charter's cable MVPD system is not because they lack a critical technology over which Charter has sole control, as all set-top boxes utilize the same basic technology and components.  Rather, Charter either instructs its cable MVPD system not to acknowledge those set-top boxes or its cable MVPD system uses a specific software and Charter refuses to download that software onto set-top boxes that it does not distribute.

37.     The monthly rental fee that Charter charges consumers for set-top boxes quickly adds up to more than the price that Charter paid to purchase the set-top boxes in the first place.

38.     Charter purchases set-top boxes from several consumer electronics manufacturers at a price that can only be determined through discovery.  However, it is estimated that the useful life of set-top boxes runs from three to five years.  Even if Charter purchases set-top boxes for $110, which is the price at which retail consumers can purchase a single set-top box from www.newelectronix.com, Charter's monthly rental fee of will surpass $110 in less than two years, leaving Charter with a minimum of one year of pure profits and consumers with a substantial loss.  Upon information and belief, Charter purchases its set-top boxes in bulk at much lower costs than the cost to retail consumer.

39.     Congress indicated in Section 629 of the Communications Act that it expects consumers to have choice in their selection of set-top boxes.  47 U.S.C. § 549. The FCC has interpreted Section 629 as prohibiting cable MVPD providers from taking advantage of their security concerns to require consumers to use the set-top boxes that they distribute.

40.     Although cable-ready televisions have the technological capacity to receive certain Premium Cable services, cable MVPD providers, including Charter, encrypt or scramble the data they transmit through their cable MVPD systems.  This security practice prevents consumers from receiving Premium Cable services to which they do not subscribe.  Cable MVPD providers do not employ this security measure for Basic Cable, which means that consumers can access and view Basic Cable with a cable-ready television.

41.     Presently, consumers need a special device to descramble or unencrypt Premium Cable.  Consumers who do not have such a device will not be able to access or view the Premium Cable services to which they subscribe.

42.     There is no valid reason technologically or otherwise to bundle the device that performs this security function with the digital conversion and two-way communication functions of set-top boxes or to stifle innovation into new technologies by a competitive market.  Nevertheless, cable MVPD providers, including Charter, have done just that and have successfully taken steps to ensure that most consumers do not receive the security device separate from a set-top box.

43.     In response, the FCC prohibited cable MVPD providers from requiring consumers to use security devices that are integrated with set-top boxes.   This

prohibition, sometimes referred to as the "integration ban," recognizes that when cable providers succeed in creating an environment in which consumers must use the set-top boxes that they distribute, competition in the set-top box market will be drastically reduced. It also implicitly recognizes that cable providers have economic power in markets related to the provision of cable MVPD.

44. Charter has, at best, made minimal efforts to comply with the integration ban. It nominally offers a device known as a CableCARD, which can perform the required security function and which can be plugged directly into certain cable-ready televisions and, in theory, into certain non-integrated set-top boxes.

45. CableCARDs are by definition not substitutes for set-top boxes, for they do not perform two-way communication and thus do not allow Premium Cable subscribers to access valuable Premium Cable services that they have purchased. Charter is quick to acknowledges as much on its website, where it states:

> The currently available CableCARD TVs and CableCARDs do not support interactive services such as Pay-Per-View, Video On Demand, iTV, or Interactive Program Guides..

Charter                                                                                website, http://www.charter.com/customers/support.aspx?SupportArticleID=15 (last visited March 29, 2010).

46. Charter has taken additional measures to limit the availability and attractiveness of CableCARDs. For example, Charter readily acknowledges on its website:

> "CableCARDs will not provide access to digitally encrypted channels in areas where Charter has implemented Switched Digital Video (SDV). In SDV areas, HDTV CableCARD customers will need an HD Receiver to view digitally encrypted channels. Customers using a CableCARD TiVO device will need to install a Tuning Adapter to view digitally encrypted channels. "

http://www.charter.com/customers/support.aspx?SupportArticleID=15 (last visited March 29, 2010).

Among other things, Charter also requires Premium Cable subscribers to rent the CableCARDS that it distributes and charges them an installation fee.  That charge is particularly egregious, as the installation simply consists of inserting a CableCARD into an open slot in a cable-ready television.  Cable MVPDs have, as a whole, failed to make efforts to offer CableCARD technology as a viable option to their customers. Though Charter's customer statistics are currently unavailable, and would be available through discovery, it would not be presumptive to assume their numbers are comparable to other major cable MVPDs. According to the National Cable and Telecommunications Association's filings with the FCC, the total number of Cablecards in service with Charter through November 30, 2009 is approximately 30,165.  In fact, in that same filing Charter only noted 19,076 Cablecards in inventory.  By comparison, Charter has millions of set-top boxes in service. Charter's conduct, along with similar tactics from other cable MVPD providers, led the Consumer Electronics Association ("CEA") to raise an objection with the FCC in December of 2006 detailing how cable MVPD providers were preventing consumer electronics manufacturers from selling unintegrated set-top boxes to consumers.  The existence of the Cablecard has not produced the intended result of introducing competition into the market for cable boxes.

47.     In essence, Charter is doing everything in its power to protect its illegal tie of Premium Cable to set-top boxes.

48.     Charter further limits the functionality of CableCards in the following ways:

-   CableCards do not allow consumers to order advanced services such as pay-per-view events or premium sports packages:

-   CableCards do not provide the channel guide services of set-top boxes:

-   CableCards are not enabled to provide two-way services such as the interactive program guide, or certain pay-per-view events.

These limitations coupled with the fact that Charter forces its customers to also rent the CableCard severely limited the desirability of CableCards, so that actual coercion exist as to the set top box.


Charter Possesses Economic Power In The Tying Market

49.     As numerous statistics demonstrate, Charter has the requisite economic power to force consumers to submit to its illegal tying practice.

50.     Those statistics include direct evidence of Charter's consistently rising price for Premium Cable and corresponding evidence of Charter's substantial market share.

*Charter Regularly Increases The Price Of Premium Cable*

51.     The average cable MVPD prices have increased over 90%, more than three times the rate of inflation, during the last ten years.  That is not surprising, for, as discussed in greater detail below, cable MVPD providers operate in virtual monopolies, typically isolated from one and other and largely free from any other competition.

52.     According to the Thirteenth Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, issued by the FCC on

January 19, 2009,( the Report), although video programming is distributed by means other than cable, most notably broadcast and satellite services, cable MPVD is the dominant force in the market, and enjoys a nationwide market share of almost 70%.  A Congressional research report in 2007 found that cable controlled 69% of the nationwide MPVD market, compared to 27.7 for direct satellite transmission.  Moreover, any nationwide statistic on cable vs. satellite MPVD competition under-represents Charter's competitive position in the markets in which it chooses to do business, in that satellite MVPD services are available in areas in which no cable television service is available.  Conversely, in urban areas, the physical requirements required to receive satellite MVPD services, (an external surface with a clear sight line to the sky on which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and apartment owners by landlords and/or condominium or cooperative rules.  The difficulty in meeting the physical requirements for receiving satellite MPVD services further limits the competitive pressure of satellite services upon cable services.  Thus, a 2005 general accounting office ("GA") study found that satellite MVPD market penetration was only 13% in urban areas, compared to 29% in rural areas.

53.    In addition to Charter's claimed superiority in service and reliability over satellite MVPD services, Charter enjoys a competitive advantage over such services by its ability to "bundle" its MVPD services with broadband internet access and phone service, provided over the same cable facilities.  Because broadband internet access and phone service are not available through satellite MVPD technology, Charter enjoys a competitive advantage over satellite MVPDs in those areas in which Charter does business.

54.     Moreover, in those markets in which Charter does business, it has a further advantage as the incumbent service provider in that switching from Charter cable to another MVPD provider, whether an overbuilder, an incumbent phone company or a satellite MVPD, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change.  Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree (less than 50%) of satisfaction with their service, there remains little movement between the two.

55.     As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services.  It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite, despite monopoly pricing for existing customers of the cable MVPD.  The Report cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs.  However, in a few locations where consumers have a choice between two cable services, the FCC reports that prices for cable services are 20% lower than in locations with only one cable MVPD.

56.     Likewise, the Report found that another major factor in the projected growth of the cable MVPD industry to $72.9 billion in 2006 is raising cable MVPD prices.

57.     One of the largest cable MVPD providers in the country, Charter has repeatedly raised the price of Premium Cable over the last ten years.

14

58.     Charter's ability to raise the price of Premium Cable demonstrates that it has sufficient economic power to unlawfully tie set-top boxes to Premium Cable.

*Charter Has A Substantial Share Of The Relevant Market*

59.     The relevant product is the provision of Premium Cable MVPD.

60.     The Report found that the demand for Premium Cable's unique and high-quality service has consistently grown since the product's inception.

61.     Charter's most recent 10-k filing, which is from 2009 and cover most of the areas in which Charter provides cable MVPD, comport with that finding and indicate high demand for its Premium Cable.   The filing indicates that Charter currently has 3,218,100 Digital video customers.   Charter defines Digital Video customers to "include all basic video customers that have one or more digital set-top boxes or cable cards deployed."

62.     Cable MVPD, which consists of Premium Cable and Basic Cable, is the dominant form of MVPD.   According to a 2007 Congressional research report, Cable MVPD makes up 69% of all MVPD in the United States.

63.     The remaining MVPD is primarily transmitted by satellite.   Satellite MVPD, however, is not reasonably interchangeable with cable MVPD.   Studies have found that MVPD users exhibit low rates of switching between cable and satellite.   That is especially significant given that, in consumer surveys, satellite users express high levels of satisfaction with their service, while less than fifty percent of cable users express satisfaction with their service.

64.     Along with other important distinctions, significant technological differences between cable MVPD and satellite MVPD largely explain why consumers do not consider the two products reasonably interchangeable.

65.     The infrastructure supporting cable MVPD and the infrastructure supporting satellite MVPD function optimally in different settings.  Cable MVPD tends to operate best in more densely populated areas where its network of wires can reach large numbers of people and justify the high cost of building the network.  By contrast, satellite MVPD tends to operate best in rural areas, where there is more space to place dishes, fewer buildings such as condominiums that prohibit dishes, and more clear sight lines for dishes to access the sky.  Indeed, as the Report found, the technological requirements for satellite MVPD mean that satellite MVPD penetration even varies within specific communities.

66.     The equipment that consumers need to access cable MVPD is distinct from the equipment that they need to access satellite MVPD.  Significantly, replacing cable MVPD with satellite MVPD entails switching costs, in terms of the time required to install the new equipment, during which consumers may not have any MVPD service, the cost of new equipment and other factors.

67.     Moreover, as the Report notes, cable MVPD providers offer premium services not offered by satellite, and the number of consumers who subscribe to Premium Cable continues to grow.  Satellite MVPD providers also do not always carry local channels.

68.     The Report offers further evidence that satellite MVPD is not a reasonable substitute for cable MVPD.  It found that in the few areas where more than one cable

MVPD provider operate, the price of cable services has declined by as much as 20%, but in the areas where a single cable MVPD operates, the availability of satellite MVPD has completely failed to restrain cable MVPD providers from rising significantly.

69.     While other forms of MVPD besides cable and satellite exist, the Report found that they serve small numbers of subscribers in limited areas.

70.     Most of those other forms of MVPD transmit data over a "wireline" system.  Wireline systems include, among other thing, cable providers and fiber optic telephone lines.  Wireline challengers to an incumbent cable MVPD provider are commonly referred to as "overbuilders."

71.     Potential challengers to an incumbent cable MVPD provider that transmit data through a wireline system, be it cable MVPD or another form of MVPD, face significant entry barriers.  Indeed, the Report found that relatively few consumers have a second wireline alternative, whether cable MVPD or another form of MVPD.

72.     The first and most basic barrier to entry is the huge cost of building a wireline MVPD system.  According to the Report, cable MVPD providers have invested over $100 billion to construct advanced two-ay fiber optic networks.  It is estimated that they spent $10.6 billion on capital improvements in 2005 and $11.1 billion in 2006.  These advances allow cable MVPD providers to offer Premium Cable.  An MVPD provider whose infrastructure does not allow it to offer premium services simply cannot compete with an incumbent cable MVPD provider.

73.     Moreover, whereas incumbent MVPD providers faced virtually no competition when they were building their infrastructure and have been able to self-finance advanced infrastructure projects with high prices, challengers will have to charge

lower, competitive prices and seek outside financing to acquire the necessary infrastructure.

74.     Not surprisingly, potential challengers claim that incumbent cable MVPD providers engage in predatory pricing to drive the challengers' revenues down to levels where they cannot recoup the costs of constructing their infrastructure.

75.     Incumbent cable MVPD providers thus have a classic first mover advantage and are in a unique position to maintain, and take advantage of, the necessary economies of scale and scope.

76.     Second, the FCC found that the franchising process in many localities is a barrier to entry.  Local franchising authorities often impose "build-out" requirements mandating that a new entrant overbuild all of the geographic area served by the incumbent cable MVPD provider.  They also commonly impose "level playing field" regulations requiring a new entrant to match all of the concessions provided by the incumbent cable MVPD provider.  Such requirements create major risks for potential challengers, as they force challengers to incur costs even when they are not justified by prevailing market conditions.  In addition, the FCC found evidence of regulatory capture of the local franchising authorities by incumbent cable MVPD providers, including unreasonable delays in determining whether to grant challengers franchises and demanding in-kind payments from challengers.  As a consequence, the FCC recently promulgated rules intended to limit the negative effects of local franchising authorities.

77.     A third entry barrier is that incumbent cable MVPD providers offer valuable programming to which challengers do not have access.  Incumbent cable MVPD providers often have exclusive contracts with key content providers who control the

programming that is most important to consumers, such as regional sports networks.  In addition, incumbent cable MVPD providers own or control a number of popular content providers, and, under certain circumstances, are permitted to refuse to provide potential challengers with that content or to provide them with that content on discriminatory terms.  This further limits potential challengers' ability to offer competitive products.

78.    Special circumstances surrounding multiple dwelling units ("MDUs"), such as apartment buildings and cooperatives, form a fourth entry barrier.  Incumbent cable MVPD providers often have long-term contracts, with automatic renewal privileges, to serve as the exclusive MVPD provider for MDUs.  With thirty to thirty-five percent of the country's population living in MDUs, that means that incumbent cable providers have already locked up a significant segment of potential consumers. Furthermore, these exclusive contracts magnify the impediments created by build-out requirements, which would require potential challengers to pay to extend their wireline systems to countless MDUs where they have little hope of obtaining customers.

79.    Thus, even assuming that other forms of wireline MVPD are substitutes for cable MVPD, the many substantial entry barriers have kept their market share so low that they lack the power to constrain cable MVPD providers.

80.    As for potential cable MVPD challengers, the Report found that, due to these entry barriers, they cannot reasonably expect to capture more than a fraction of the incumbent cable MVPD provider's business.

81.    Similarly, the Report stated that the entry barriers have led incumbent cable MVPD providers to "cluster" their systems in different areas rather than directly compete against each other.

82.     Thus there is no product that is reasonably interchangeable with cable MVPD that has any appreciable market share or that threatens the economic power of incumbent cable MVPD providers.

83.     Market data further highlights the strength of these entry barriers and the dearth of competition for incumbent cable MVPD providers.

84.     The foregoing makes clear that Charter has sufficient economic power in all of the areas in which it operates to enforce its illegal tying scheme.

85.     Indeed, Charter has such a staggering share of the potential subscribers in the areas in which it operates that even if satellite MVPD was considered part of the relevant market, Charter would still have sufficient economic power to enforce its illegal tie.

86.     Charter's economic power over the provision of cable MVPD translates into power over both Basic Cable and Premium Cable.  That is because the two products are distributed over the same cable MVPD network.

87.     Additional market data information, which is only available through discovery, will provide greater detail of Charter's economic power.

88.     The relevant geographic market is the areas in which Charter provides Premium Cable.

89.     Those areas are certain communities in 27 states throughout the United States.

90.     Charter possesses the requisite economic power to impose a tie and imposes the same relevant policies in all of the areas in which it operates.  Accordingly, those areas form one geographic market for the purposes of this matter.

20

91.     In the alternative, each of the local areas in which Charter operates is a relevant geographic market.

Anticompetitive Effects in the Tied Market

92.     As noted above, for most of the relevant time period, the United States market for set-top boxes has been dominated by just two companies for years, Scientific Atlanta and Motorola.

93.     Charter is simply purchasing set-top boxes at a fixed cost from the manufacturers only to turn around and rent the very same boxes to the Class, with full knowledge that the Class, as a result of Charter's improper conduct, has no choice but to pay the rental fees charged.

94.     Charter refuses to permit customers to use other brands of set-top boxes, Charter refused to sell its customers the set-top boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a Charter system.

95.     Upon information and belief, Charter's suppliers of set-top boxes are able to dominate the market as a result of the anticompetitive conduct of Charter and other cable MVPDs.  Because Charter and other cable MVPDs refuse to permit customers to acquire set-top boxes other than by rental through the cable company, consumers suffer, and the suppliers to Charter and other cable MVPDs benefit from the removal of competitors and competition in the market for set-top boxes.  At the same time, Charter benefits from the absence of a competitive consumer market for set-top boxes because the absence of competition allows Charter to compel consumers to rent the set-top box

from Charter, thereby producing a monthly revenue stream from the Class to Charter arising directly from its anticompetitive conduct.

96.     The contracts between Charter and the suppliers for set-top boxes are not public information but are in the possession of Charter and may be obtained in discovery. It is not presently known whether such contracts contain an explicit agreement by the manufacturers to refuse to deal with the general public in selling set-top boxes.

97.     If not for the tying of products, Plaintiff and the Class could purchase a set-top box from a manufacturer of their choice and use it to access the Premium Cable Services provided (for a cost) by Charter.  As noted above, the CEA (previously defined) has expressed not only a willingness to enter into the set-top box market, but has protested to the FCC that Charter and other major cable MVPDs have engaged in apparently coordinated efforts to keep them out of the market.

98.     As pointed out by the CEA's December 2006, letter to the FCC, although Charter and other cable MVPDs reported to the FCC that they were committed to the true2way technology, these same companies had previously represented that they were committed to the CableCard.  Quite obviously, consumer electronic manufacturers have not been willing to commit their resources to new product lines when cable MVPDs have demonstrated a desire to preserve their market positions by changing the technological standard.  The choice to use alternative technologies in lieu of a Charter set-top box, has not been available, and is not currently available to the Class.

99.     The choice to use other cable boxes is not available to the Class as a result of Charter's practices.  By compelling customers to rent set-top boxes, and in restraining an open market for set-top boxes, Charter coerces Plaintiff and the Class to pay a

significantly larger sum of money than would be required of the two distinct products (Premium Cable Services and set-top box) were not tied by Charter.

100.     It is estimated that the useful life of a cable box is between 3 and 5 years. In many cases, the rental fees that the Class is forced to pay for the set-top boxes supplied by Charter exceed the true cost of the set-top box, even if the cost of the set-top box were unadjusted for the effect of the anticompetitive practices on the price of the set-top boxes.

Charter's Illegal Tie Affects A Not Insubstantial Amount Of Commerce In The
Market For Set-Top Boxes

101.     Only Premium Cable subscribers will seek to acquire set-top boxes.

102.     Consumers seeking set-top boxes can purchase them from retailers such as www.newelectronix.com for approximately $110.

103.     Given the efforts of Charter and the other cable MVPD providers to control the provision of set-top boxes through the illegal tie, the fact that set-top boxes are being sold at all shows the eagerness of consumers to secure set-top boxes in an open market.

104.     Consumer electronics manufacturers have noted that eagerness and objected to the FCC regarding the conduct of cable providers that restricts their ability to sell unintegrated set-top boxes to Premium Cable subscribers.

105.     The fact that Premium Cable subscribers have, for the most part, succumbed to cable MVPD providers' inflated pricing of set-top boxes offers additional incentive to consumer electronics manufacturers, for it shows the high value that consumers place on Premium Cable and set-top boxes.  Indeed, with their history of entering a wide range of markets and offering innovative, attractive, and successful

products, the prospect for consumer electronics manufacturers to sell unintegrated set-top boxes to Premium Cable subscribers should be great.

106.   If not for Charter's and the other cable MVPD providers' illegal tying practices, substantially more set-top boxes would be sold on the open market than is presently the case.

<u>Charter's Illegal Tie Affects A Not Insubstantial Amount Of Interstate Commerce</u>

107.   Charter provides cable MVPD to millions of customers throughout the United States.

108.   Many of those customers subscribe to Charter's Premium Cable services and almost every member of that group rents set-top boxes from Charter, which Charter purchases from consumer electronics manufacturers in different parts of the country.

109.   The exact amount of money Charter generates from renting set-top boxes can only be determined through discovery, but it is certainly not insubstantial.

## **CLASS ACTION ALLEGATIONS**

110.   Pursuant to Fed. R. Civ. P. 23(b)(1), (2) and (3), Plaintiffs bring this action on behalf of themselves and all others similarly situated as members of the proposed Class.  That Class is defined as follows:

> All persons in the United States who subscribed to Charter for Premium Cable and paid Charter a monthly rental fee for an accompanying set-top box.

> Excluded from the Class are those Charter customers who receive cable MVPD service from Charter at an address at which they may receive MVPD service from at least one other cable MVPD provider in addition to Charter; however, this exclusion shall only apply as of the date such competing service became available and does not defeat such class members' right to a remedy for injuries suffered prior to the existence of such competition.

> Excluded from the Class are Charter officers, directors or employees, any entity in which Charter has a controlling interest, the affiliates, legal representatives, attorneys, heirs or assigns of Charter, and any federal, state, or local governmental agency, and any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staffs.

111.    Plaintiff Gerald Paul Bodet also bring this action on behalf of a Louisiana subclass defined as follows:

> Persons throughout the State of Louisiana who reside in geographic areas where Charter has a more that 50% share of the digital cable television market, who subscribe to Charter's digital cable television service during the applicable statute of limitations period(s), and who were required to and did pay a monthly fee to Charter for the use of a set-top box.

112.    Plaintiffs seek certification of the Class and subclasses under Federal Rules of Civil Procedure Rule 23(a) and (b)(3).

113.    <u>Numerosity:</u>  The members of the Class and subclasses are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members and the subclasses include hundreds, if not thousands, of individual members; (b) the precise number of Class and subclass members and their identities are unknown to Plaintiffs but are well known to Defendants and can easily be determined through discovery; (c) it would be impractical and a waste of judicial resources for each of the thousands of individual Class members and subclass members to be individually represented in separate actions; and (d) the relatively small amount of damages suffered by some of the Class and subclass members does not make it economically feasible for those Class and subclass members to file individual actions to protect their rights.

114.   <u>Commonality/Predominance:</u>   Common questions of law and fact predominate over any questions affecting only individual Class and subclass members. These common legal and factual questions include, but are not limited to, the following:

- Whether Charter is liable to Plaintiffs and the Class for violations of federal antitrust laws;

- Whether Charter has established an unlawful tying arrangement for the rental of set-top boxes, in violation of federal laws;

- Whether Charter's actions have caused damages to Plaintiffs and the Class;

- Whether Charter should be enjoined from further violations of state and federal laws;

- Whether Charter is liable to Plaintiffs and the Class for treble damages as a result of its violation of federal antitrust laws.

- whether Defendant's acts and omissions alleged herein constitute a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law sections 51:1401 *et. seq.*;

115.   <u>Typicality:</u>  Plaintiffs' claims are typical of the claims of the Class and subclass members.  Plaintiffs and all Class and subclass members have been injured by the same wrongful practices engaged in by Defendants.  Plaintiffs' claims arise from the same practices and course of conduct that gives rise to the claims of the Class and subclass members and are based on the same legal theories.

116.  <u>Adequacy</u>:  Plaintiffs will fully and adequately assert and protect the interests of the Class and subclasses they seek to represent.  Plaintiffs have retained counsel who are experienced in class actions and complex mass tort litigation.  Neither Plaintiffs nor their counsel have interests contrary to or conflicting with the interests of the Class or subclasses.

117.  <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the Class members and subclass members is economically unfeasible and impractical.  While the aggregate amount of the damages suffered by the Class is in the millions of dollars, the individual damages suffered by each Class member and subclass member as a result of the wrongful conduct by Defendants are too small to warrant the expense of individual lawsuits.  Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

118.  Plaintiffs do not anticipate any difficulties in the management of this litigation.  The federal courts have substantial experience in managing antitrust class actions.

## **COUNT I**

### **(Violation of Section 1 of the Sherman Act for Unlawful Tying)**

119.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

120.    The Sherman Act makes it unlawful to enter into a contract in restraint of trade or commerce.  15 U.S.C. § 1.  Congress has granted a private right of action to individuals harmed by violations of this act.  15 U.S.C. § 15.

121.    Plaintiffs, on their own behalf and on behalf of the Class, seek to recover damages they suffered as a result of Charter's violation of the Sherman Act.

122.    Charter improperly ties its Premium Cable service to the rental of set-top boxes that it distributes.  Specifically, as explained above, Charter contracted with Plaintiffs and all Class Members to provide Premium Cable on the condition that Plaintiffs and all Class Members also rent the set-top boxes that it distributes.

123.    No Class Member can untie the two products at issue, Premium Cable and set-top boxes.

124.    The market for set-top boxes is separate and distinct from the market for Premium Cable, just as a set-top box is a separate product from Premium Cable.

125.    Charter has sufficient economic power in the areas in which it operates to force Class Members to rent the set-top boxes that it distributes and to deny Class Members the opportunity to acquire set-top boxes in an open market.  Indeed, Charter compels Class Members to rent set-top boxes at prices that quickly add up to more than the amount Charter paid to purchase them in the first place.

126.    By forcing Class Members to rent the set-top boxes that it distributes, Charter significantly restrains the ability of consumer electronics manufacturers to sell set-top boxes and the ability of consumers to purchase set-top boxes at retail.

127.    This improper tying arrangement harms competition.

128.    Charter's conduct affects a substantial amount of interstate commerce in the market for set-top boxes.

129.    There is no lawful justification for that conduct, which causes direct harm to the Class Members.

130.    Charter's tying arrangement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

## COUNT II

**(Violation of State Antitrust Laws on Behalf of All Plaintiffs
Against All Defendants)**

131.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs.

132.    Defendants' wrongful acts violated the Federal Sherman Antitrust Act (15 U.S.C. §1, *et seq.*) as set forth above.

133.    Defendants' same actions violated the state antitrust statutes of the various states in which Defendants do business (including but not limited to the Louisiana Antitrust Act, La. R.S. §51:122, *et seq.*

## COUNT III

**(Unjust Enrichment on Behalf of All Plaintiffs As Against All Defendants)**

134.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs.

135.    Defendants have been unjustly enriched in the amount of the profits they have earned as a result of the Defendants' conduct as alleged herein.

136.    Defendants have been unjustly enriched at the expense of and to the detriment of the Plaintiffs and each member of the Class.

137.    Defendants should be ordered to disgorge the profits they have made from their wrongful and illegal conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, demands judgment in their favor and against Charter as follows:

a.      For an order certifying the Class pursuant to Fed. R. Civ. P. 23, appointing Plaintiffs as the Class Representatives, and appointing counsel as Plaintiffs counsel for the class;

b.      For an Order that Charter violated the Sherman Act, 15 U.S.C. § 1;

c.      For an Order that Charter violated the State antitrust laws listed above;

d.      For an Order that Charter unjustly enriched itself at the Class' expense;

e.      For an Order that Charter violated La. R.S. §51:122, *et seq*;

f.      For an Order enjoining Charter from continuing the practice of tying premium cable services to the rental of a set-top box from Charter;

g.      For an award of all statutory damages under the Sherman Act;

h.      For an award of all compensatory and other damages suffered by Plaintiffs and the Class;

i.      For an award of all costs incurred by Plaintiffs in pursuing this actions;

j.      For an award of reasonable attorneys' fees;

k.      For any other relief the Court deems reasonable.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable.

Dated the 31st day of March, 2010.

Respectfully Submitted,

/s/Jeffrey P. Berniard
**JEFFREY BERNIARD, LSBA #29088**
Berniard Law Firm
643 Magazine St., Suite 402
New Orleans, LA 70130
Telephone: (504)527-6225
Facsimile: (504) 617-6300
Email: Jeffberniard@laclaim.com

**MADRO BANDARIES, PLC # 25339**
Post Office Box 56458
938 Lafayette Street, Suite 204
New Orleans, Louisiana 70156
Telephone:    (504) 218 – 4815
Facsimile:    (504) 324 – 0684

**GREGORY P. DI LEO, LSBA #4943**
**JENNIFER B. EAGAN, LSBA #19847**
300 Lafayette Street, Suite 101
New Orleans, LA  70130
Telephone:  (504) 522-3456
Facsimile:    (504) 522-3888

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleadings upon all counsel of record, by electronic transmission, email, and /or first class mail this 31st day of March, 2010.

/s/ Jeffrey Berniard
Jeffrey Berniard